UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PATRICIA SOLVIBILE, individually and on behalf of all Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ATLANTIC POWER CORPORATION and BARRY WELCH<br><br>Defendants. | Civ. Action No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Atlantic Power Corporation ("AT" or the "Company"), as well as press releases and media reports about AT and statements made by Barry Welch ("Welch"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal class action on behalf of purchasers of the common stock of AT between August 8, 2012 and February 28, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

**JURISDICTION AND VENUE**

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). AT maintains offices in this District.

5. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

6. Plaintiff Patricia Solvibile, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of AT during the Class Period and has been damaged thereby.

7. Defendant AT is a leading publicly traded, power generation and infrastructure company with a well-diversified portfolio of assets in the United States and Canada. The Company's corporate strategy is to increase the value of the Company through accretive acquisitions in North American markets while generating stable, contracted cash flows from its existing assets. The Company's power generation projects sell electricity to utilities and other large commercial customers under long-term Power Purchase Agreements ("PPAs"), which seek to minimize exposure to changes in commodity prices. The net generating capacity of the Company's projects is approximately 2,560 MW, consisting of interests in 33 operational power generation projects across 12 states and 2 provinces and also an 84-mile, 500 kilovolt electric transmission line located in California. In addition, the Company has a 53 MW biomass project under construction in Georgia, which is expected to achieve a commercial operation date ("COD") in the first quarter of 2013. Atlantic Power owns a majority interest in Rollcast Energy,

a biomass power plant developer in Charlotte, NC. The Company also owns Ridgeline, a renewable development company in Seattle, WA with approximately 1,000 MW of wind and solar projects under development. Atlantic Power is incorporated in British Columbia, is headquartered in Boston and has offices in Chicago, Toronto, Vancouver, Seattle and San Diego.

8. Defendant Welch is, and was at all relevant times, AT's President and Chief Executive Officer, and a Director of the Board. Welch was also the principal spokesperson for AT during the Class Period. Welch controlled the decision and public statements concerning the dividend on AT's common stock. Welch had a duty to timely, fully and truthfully disclose all material facts and information concerning AT's dividend on its common stock during the Class Period.

9. Each defendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of AT common stock by disseminating materially false and misleading statements and/or omitting or concealing material adverse facts. The scheme: (i) deceived the investing public regarding the payment of the dividend on the common stock of AT; and (ii) caused Plaintiff and members of the Class to purchase AT common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

10. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of AT between August 8, 2012 and February 28, 2013, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of AT and members of their immediate families and their legal representatives, heirs, successors or assigns.

11. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AT's common stock was actively traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AT". While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. As of February 27, 2013, AT has over 119 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by AT or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

12. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

13. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

14. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about Defendants' actions with respect to the dividend on AT's common stock;

    c. whether the price of AT common stock was artificially inflated during the Class Period; and

d.  to what extent the members of the Class have sustained damages and the proper measure of damages.

15. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

16. On November 24, 2009, AT's shareholders approved its conversion to a common share structure.  Following AT's acquisition in November 2011, the monthly dividend rate was increased to C$0.0958 per common share. As noted in AT's SEC filings, future dividends are paid at the discretion of AT's Board of Directors subject to, among other things, earnings and cash flow and are not guaranteed.  Nevertheless, as noted by Defendant Welch during a November 6, 2012 conference call when asked about the process of analysis for the dividend, he emphasized, that "its' quite a long-term projection that we used to take that look."  Thus, a decision to decrease the dividend is not made suddenly but entails an involved process.

17. The sustainability of AT's stock dividend was regarded by the Company as one of its corporate objectives.  It was also highly regarded by shareholders and the marketplace, and one of the reasons the Company's dividend reinvestment program was desired.

18. On August 8, 2012, AT released its results for the three and six months ended June 30, 2012.  The Company reported that it received net proceeds of $192.5 million from the closing of concurrent equity and convertible debenture offerings, it received cash proceeds of $30.2 million from the sale of its interest in Primary Energy Recycling Holdings LLC,

announced a dividend reinvestment program or DRIP and project adjusted EBITDA increased by $29.9 million or 70% for the quarter as compared to the prior year's same quarter, and increased by $86.8 million or 110% for the six months compared to the prior year's same period.

19.     Also on August 8, 2012, the Company held an earnings conference call. During this call, defendant Welch addressed the cash flow and sustainability of the dividend by noting:

> As we've also discussed, a number of items will help offset anticipated decreases in cash flow from Lake and Auburndale. We expect cash flows from Orlando will increase substantially following rather the expiration of the projects, current above-market gas contract at the end of 2013.
>
> Orlando's PPA runs through 2023. Buying gas at lower prices starting in 2014 will increase Orlando's operating margin and we've already begun hedging those gas prices in 2014 to 2017, and the PPA's capacity payments also increase slightly each year.
>
> In total, we estimate the increase in our distributions from Orlando versus our estimate of 2013 cash flow to be approximately $14 million to $18 million on average between the years of 2014 and 2018. Other increases to cash flow include the previously guided $8 million to $10 million expected cash distributions from our Piedmont project for each full year of operation starting in 2013, $16 million to $19 million from our Canadian Hills project for each full year through 2020, at which time we expect distributions to increase, and improved cash flows from some of our gas-fired projects due to the impact of low natural gas prices on the unhedged portion of our gas purchases. *It is these increases, plus expected contributions from continued accretive acquisitions that provide our comfort level with the sustainability of the current dividend*.
>
> In addition, we're very pleased to have announced our Dividend Reinvestment Program or DRIP this morning. Our retail merchants have been requesting that we start a DRIP for some time and we're pleased to have registered both our S-3 shelf prospectus and a supplement for the DRIP this morning. Information about the program can be found in the Investors section of our website. And those interested in participating in the program should contact their broker.

20.     On November 5, 2012, the Company released its results for the three and nine months ended September 30, 2012. The highlights for the quarter were an increase in cash flows from operating activities by $13.1 million or 61% for the quarter as compared to the prior year's same quarter and an increase in project adjusted EBIDTA by $43.3 million or 128% from the prior year's same quarter. In discussing the outlook for 2012, the Company announced that "it

expects, based on its growth assumptions, that there will be additional contributions from acquisitions and dispositions, which are expected to further support the Company's continued ability to pay its dividend."

21.     During the investor earnings conference call held the next morning, on November 6, 2012, in responding to a question about the process to assess the sustainability of the dividend, the following transpired:

> Our next question is from Nelson Ng from RBC Capital Markets.
>
> **Nelson Ng** - RBC Capital Markets, LLC, Research Division
>
> Most of my questions have been answered, so I just have a few. Regarding the dividend sustainability, how far do you look ahead in terms of like whether it's like a few months or whether it's several years, like how far do you look ahead when you assess the sustainability?
>
> **Barry E. Welch** - Chief Executive Officer, President and Director
>
> Well, when we're doing our long-term planning together with the board on a periodic basis, we look at very long-term projections of cash flows. So obviously, the uncertainty increases on all of the assumptions that go into those projections, when you go out over time, including how you're existing assets are going to perform. And then, very importantly, how the growth assumptions are going to play out in terms of both the amount of capital deployed, the amount of accretion available, the mix of projects. So we end up looking at quite a few scenarios around those types of assumptions to see what things to look at. But it's quite a long-term projection that we used to take that look.
>
> **Nelson Ng** - RBC Capital Markets, LLC, Research Division
>
> And then, do you mainly rely on like your Payout Ratio calculation? Or do you take other things into consideration like asset sales? Because I know you just mentioned earlier that asset sales are not included in your project distribution calculation, so do you focus on specific ratios?
>
> **Barry E. Welch** - Chief Executive Officer, President and Director
>
> Well, certainly, we want to know there's cash in the system to be comfortable with the dividend and that can be contribution -- in the near-term, obviously, that could be contributions both from existing projects as well as from dispositions. Regardless of whether it's in the Payout Ratio or not, it can contribute to comfort. Over the long term, we have to look at the number of other things beyond the Payout Ratio. Obviously, one of the more fundamental ones being the leverage and our debt covenants at the corporate level to be sure that as we plan for the future that we are not getting ourselves in terms of the assets we'll buy, the amount of leverage it puts on the system, vis-à-vis those covenants. That's another example of a very fundamental item that we look at in that planning process.

22.     Defendants' statements as alleged in paragraphs 16 through 21, herein, were false and misleading when made and omitted to disclose the material facts that defendants would not be able to sustain the dividend at current levels, by reason of AT's admittedly deteriorating financial condition, outlook for continuing and increasing losses and desperate need to generate and preserve capital, and would be required to cut the common stock dividend in 2013.

23.     Suddenly, without any warning and in stark contrast to all of their previous statements, as alleged above, defendants issued a press release, filed with the SEC, on February 28, 2013, stating that in order to "target a lower, more sustainable payout ratio that balances yield and growth," the Board, with management's recommendation was cutting AT's common stock dividend by more than 50% commencing with the March 2013 dividend, thus paying an annual dividend of only Cdn$0.40 per share, down from Cdn$0.90 per share.  The market reacted immediately and the price of AT common stock fell from an opening price of $10.25 on February 28, 2012 to a closing price of $7.12 on March 1, 2013, and a further drop on March 4 to $5.91 closing price on trading volume of over 9 million shares.

24.     The market for AT's common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements alleged above and failures to disclose material facts, AT's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired AT common stock relying upon the integrity of the market price of AT's common stock and market information relating to AT, and have been damaged thereby.

25.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of AT's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false

8

and misleading in that they failed to timely disclose the material adverse facts that defendants would need to cut the common stock dividend in 2013 in light of AT's financial condition.

26. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants failed to disclose the material facts that they would cut AT's common stock dividend. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment that the dividend was safe at its current level, thus causing the AT's common stock to be overvalued and artificially inflated during the Class Period. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing AT's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION/ECONOMIC LOSS

27. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of AT common stock and operated as a fraud or deceit on Class Period purchasers of AT common stock by concealing the fact that AT would need to cut its common stock dividend. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of AT common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of AT common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

28. Defendants' false and misleading statements and omissions of material fact caused AT common stock to trade at artificially inflated levels throughout the Class Period.

29. As a direct result of Defendants' announcement on February 28, 2013 and thereafter, the price of AT common stock price fell precipitously. This drop removed the inflation from the price of AT common stock causing real economic loss to investors who had purchased the Company's common stock during the Class Period.

30. The decline in the price of AT common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of AT's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme and the subsequent significant decline in the value of AT common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE**

31. At all relevant times, the market for AT common stock was an efficient market for the following reasons, among others:

    a. AT stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    b. as a regulated issuer, AT filed periodic public reports with the SEC and the NYSE;

    c. AT regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        d.    AT was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

    32.    As a result of the foregoing, the market for AT common stock promptly digested current information regarding AT and the proposed merger from all publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all purchasers of AT common stock during the Class Period suffered similar injury through their purchase of AT common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

    33.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements and omissions pleaded in this complaint. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AT who knew that those statements were false when made.

## COUNT I

## Violation of Section 10(b) of the Exchange Act
## and Rule 10b-5 Promulgated Thereunder
## Against All Defendants

34.     Plaintiff repeats and realleges the allegations set forth as though fully set forth herein.

35.     During the Class Period, Defendants disseminated false and misleading statements, and failed to disclose material facts, as alleged above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

36.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

      a.     employed devices, schemes, and artifices to defraud;

      b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Huntsman common stock during the Class Period.

37.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AT common stock.  Plaintiff and the Class would not have purchased AT common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

38. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of AT common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act against Defendant Welch

39. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

40. Defendant Welch acted as a controlling person of AT within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his positions as CEO and President and principal spokesperson and participation in the decision to cut AT's common stock dividend, defendant Welch had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of AT, as alleged herein.

41. As set forth above, AT violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. Defendant Welch is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendant Welch's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the common stock of AT during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 8, 2013               Respectfully submitted,

**BLOCK & LEVITON LLP**

By: /s/ Jason M. Leviton
Jason M. Leviton
Jeffrey C. Block
Leigh O'Neil
155 Federal Street, Suite 1303
Boston, Massachusetts 02110
Tel: (617) 398-5600
Fax: (617) 507-6020
Jason@blockesq.com
Jeff@blockesq.com
Leigh@blockesq.com

**LAW OFFICES BERNARD M. GROSS, P.C.**
Deborah R. Gross
Robert P. Frutkin
Suite 450, Wanamaker Building
100 Penn Square East
Philadelphia, Pennsylvania 19107
Tel: (215) 561-3600
Fax: (215) 561-3000

*Counsel for Plaintiff*