UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  | * |  |
| In Re: Atlantic Power Corporation | * | |
| Securities Litigation | * | Civil Action No. 1:13-cv-10537-IT |

MEMORANDUM & ORDER

March 13, 2015

TALWANI, D.J.

I.      Introduction

On February 28, 2013, Defendant Atlantic Power Corporation announced a 65%
reduction in its monthly dividend. The value of its shares of common stock decreased by
28.59% on March 1, 2013, and continued to decrease in the following days. This announcement
allegedly blindsided investors, including Plaintiffs who allege violations of (1) section 10(b) of
the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–
5, promulgated thereunder; (2) violations of Section 20(a) of the Exchange Act; and (3) unjust
enrichment against Defendants Atlantic Power, Barry E. Welch, and Terrence Ronan
("Defendants"). These claims are based on Defendants' alleged false and misleading statements
made during the period leading up to the company's announcement, in which Defendants are
accused of misleading investors as to the financial condition of the company, including its debt.

Presently before the court are Defendants' Motion to Dismiss the Consolidated Class
Action Complaint [#85] and Plaintiffs' Motion to Amend [#104]. In their motion to dismiss,

Defendants move that the Consolidated Class Action Complaint [#81] ("Complaint") be dismissed for failing to (1) allege any actionable misstatements or omissions, and (2) establish a strong inference of scienter as required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). Because the court finds that Plaintiffs have not met their burden of establishing a strong inference of scienter, and would fail to do so even if factual allegations offered in Plaintiffs' proposed Amended Consolidated Class Action Complaint ("Amended Complaint") were considered, the court ALLOWS the motion to dismiss and DENIES Plaintiffs' motion to amend as futile.

II.     Facts Alleged in the Original Complaint[1]

        A.      *Background*

        Defendant Atlantic Power operates a portfolio of power generation and infrastructure assets throughout the United States and Canada, selling the power generated by its assets or "projects" to electric utilities and other entities such as municipalities and electric cooperatives. Compl. ¶¶ 26-27. Investors are drawn to Atlantic Power because of its attractive shareholder dividend. Id. ¶ 28. The value of Atlantic Power's stock is, in part, dependent on its ability to distribute consistent dividends to shareholders. Id. ¶ 30. Indeed, Atlantic Power repeatedly stated that its goal was to generate consistent levels of cash flow from its existing assets to sustain its dividend payout while increasing the value of the company through accretive acquisitions. Id. ¶¶ 30-31.

---

[1] Because the issues analyzed here arise in the context of a motion to dismiss, this court presents the facts as they are related in Plaintiffs' Complaint, see Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008), and construes those facts in the light most favorable to Plaintiffs, see Pettengill v. Curtis, 584 F. Supp. 2d 348, 362 (D. Mass. 2008) (quoting Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007)).

On February 28, 2013, Defendants unexpectedly announced that Atlantic Power was cutting its monthly dividend by 65%. Id. ¶ 8. At the close of March 1, 2013, the company's shares of common stock dropped by $2.85 per share, almost 29% in value. Id. ¶ 9. Shortly thereafter, the company's stock price continued to decline another $1.21 per share. Id. At no time before February 28, 2013, did Defendants indicate that they expected such a dividend reduction. Id. ¶ 8.

Plaintiffs allege claims under the federal securities laws on behalf of purchasers of Atlantic Power's common stock that traded on the New York Stock Exchange between June 20, 2011, and March 4, 2013 (the "Class Period"). Id. ¶ 1. They assert that they suffered significant damages as a result of Defendants' materially false and misleading statements and omissions during the Class Period concerning the company's ability to sustain the dividend that it had previously paid out to its shareholders and the decline in market value of the company's securities. Id. ¶¶ 10, 32, 95. These materially false and misleading statements and omissions also relate to pre-Class Period statements, which repeatedly advised investors that the company's dividend was sustainable through 2016. Id. ¶ 32.

B.    *Pre-Class Statements*

Defendants' pre-Class Period statements informed investors that Atlantic Power could maintain the current level of dividends to common shareholders into 2016. For instance, on August 9, 2010, the company issued a press release stating, in relevant part, that the company was "[e]xtending minimum dividend sustainability guidance from 2015 to 2016," explaining that "cash on hand and projected cash flows from exiting projects . . . is sufficient to maintain the current level of dividends to common shareholders into 2016, before considering any positive impact from further potential acquisitions or organic growth opportunities." Id. ¶ 33. In a

November 10, 2010, press release, the company made similar statements that its recent transactions "will add to the stability and sustainability of our cash flows and dividends."  Id. ¶ 34.  This guidance was repeated in press releases from March 18, 2011, and May 11, 2011, as well as in an investor presentation filed with the SEC on March 24, 2011.  Id. ¶ 35-37.  In that investor presentation, the company claimed that in terms of its current Power Purchase Agreements ("PPAs"), it was 95% contracted through 2013.  Id. ¶ 36.

C.      *Class Period Statements*

Plaintiffs allege that Defendants issued a number of materially false and misleading statements concerning its ability to maintain the dividend and service recently acquired debt.  Id. ¶ 95.  These statements were made, according to Plaintiffs, to entice investors to purchase the company's shares.  Id. ¶ 32.

(1)      June 2011

On June 20, 2011, Defendants made certain statements in connection with its announcement that it had entered into an agreement to acquire Capital Power, LP ("CPILP").  Id. ¶ 96.  In the press release announcing the agreement, the company stated that its equity holders "are expected to enjoy strengthened dividend sustainability for the foreseeable future with immediate accretion to cash available for distribution."  Id.  The company claimed that the acquisition left it well positioned to provide the dividend in the future and stated that it "intend[ed] to increase its dividend by 5% . . . on an annual basis after the close of the transaction.  Id. ¶ 96.

On that same day, the company made similar statements in an investor presentation and on a conference call, in which Defendant Welch, in response to a question about whether the company was maintaining its previous dividend guidance, stated that "the transaction will

strengthen our ability to sustain the dividend over a longer time period," while admitting that the company had not "reassured specific guidance along those lines but the accretion allows us to be more comfortable in the foreseeable future, even at the increased dividend level." Id. ¶ 99. In response to a question concerning the amount of debt that the acquisition would bring to Atlantic Power, Defendant Welch claimed that the company could handle the debt, explaining that "leverage-wise we are really going to be at about a 50% debt-to-market cap pro forma, and a pretty good place from that point of view." Id. ¶ 101.

               (2)       August 2011

On August 12, 2011, the company issued a press release announcing its second quarter 2011 financial results, in which it "[m]aintain[ed] guidance to sustain current level of dividends into 2016, without including the positive impact of CPILP or any other acquisition." Id. ¶ 103. In the press release, Defendant Welch is quoted as stating that investors can look forward to a company "with significantly strengthened divided sustainability along with our intended 5% dividend increase following closing in the fourth quarter." Id. On an August 15, 2011, conference call, Defendant Welch reaffirmed the company's projections that it could sustain the current level of dividend into 2016 from cash on hand and cash flows from existing projects. Id. ¶ 104.

               (3)       November 2011

On a November 14, 2011, conference call discussing the third quarter 2011 financial results, Defendant Welch was asked why the company had not reaffirmed the divided into 2016 in highlighting these most recent results. Id. ¶ 106. Defendant Welch responded that the company began issuing that kind of guidance back when it was a different company and is now "considering . . . what type of guidance is appropriate given our new, much larger, more

diversified scale with now a sort of more significant track record and prospects for growth going forward." Id. Defendant Welch reaffirmed that the company did not have "concerns about being able to service the debt and refinance it," and that when the company was considering what level of leverage was appropriate, it "clearly looked at the question . . . which is being absolutely sure that we could be comfortable to service the debt." Id. ¶ 108.

(4)    February-May 2012

On February 29, 2012, the company issued a press release announcing its fourth quarter 2011 and 2011 fiscal year-end financial results, in which it stated that due to expected increased operating cash flows in 2012 and certain other events, the company expected "a significant increase in cash available for distribution." Id. ¶ 110. In a March 1, 2012, conference call, Defendant Welch stated that the company was "working to extend and optimize our existing PPAs and fuel-supply contracts with a particular near-term focus on key markets in Florida and Ontario." Id. ¶ 112. In its 2011 Annual Report, the company disclosed that it was in discussions with potential counterparties regarding new PPAs for its Lake and Auburndale facilities in Florida, both of which were set to expire by the end of 2013 and which constituted 10% and 9% of the company's 2010 adjusted Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA), respectively. Id. ¶¶ 70-73. In the March 1, 2012, conference call, Defendant Welch responded to a question expressing concern about the expiration of these contracts, stating that the company had other projects in its portfolio "that start to pop up in the other direction to bridge us back" and that "there are other things that are building or bridging us back up from the down draft of the two Lake and Auburndale." Id. ¶ 112. Plaintiffs claim that these statements were materially false and misleading because they failed to inform investors that the company would have trouble servicing its debt and paying the dividend even if the Lake and Auburndale

projects were re-contracted and because it failed to explain the extent to which the company would be harmed by the loss of those projects considering the company's mounting debt.  Id. ¶ 113.

On May 7, 2012, the company issued a press release announcing its first quarter 2012 financial results, in which it similarly stated that due to expected increased operating cash flows in 2012 and certain other events, the company expected "a significant increase in cash available for distribution from 2011."  Id. ¶ 114.

(5)     August 2012

On August 8, 2012, the company issued a press release announcing its second quarter 2012 financial results, in which it again stated that it expected improved cash flows in 2012 from 2011, which the company expected to result in a significant increase in cash available for distribution.  Id. ¶ 116.  On that same day, the company hosted a conference call, during which Defendant Welch discussed the re-contracting of the Florida projects.  Id. ¶ 118.  Defendant Welch stated that the company was "exploring all our options with potential off-takers in Florida" and that it "should have a better indication of where the negotiations are headed prior to the year-end."  Id.  Defendant Welch also stated that "a number of items will help offset anticipated decreases in cash flow from Lake and Auburndale," citing expected increased cash flows from the Orlando, Piedmont, and Canadian Hills projects.  Id.  "[T]hese increases, Defendant Welch stated, "plus expected contributions from continued accretive acquisitions . . . provide our comfort level with the sustainability of the current dividend."  Id.  When an analyst confronted him with the calculation that Piedmont and Canadian Hills would probably not make up the cash flows and asked how the company would "plug that gap," Defendant Welch noted

that the questioner had left off the Orlando increase and that the company intended to make acquisitions.  Id. ¶ 119.

On that conference call, Defendant Welch was also asked if he had any visibility on the payout ratio for 2013, to which he responded that the company had never provided such information, and that what it was "trying to do with some of the comments around Orlando and these other projects is just sort of help with the math that I know all the analysts are doing to sort of get from reduced flows from Lake and Auburndale over to the comfort zone of other things around the plus side."  Id. ¶ 120.

(6)     October-November 2012

On October 11, 2012, the company filed with the SEC an investor presentation, which stated, in relevant part, that "[c]ash flows are largely contracted, producing stable cash flows to sustain a monthly dividend (Cdn$1.15/share/year); current yield of approximately 7.8%," and that these contracted assets provide "predictable and stable revenue, margins and cash flows." Id. ¶ 120.

On November 5, 2012, the company issued a press release announcing its third quarter 2012 financial results, in which it stated that it "expects, based on its growth assumptions, that there will be additional contributions from acquisitions and dispositions, which are expected to further support [its] continued ability to pay the dividend."  Id. ¶ 126.  Moreover, in its quarterly report for the third quarter 2012, filed with the SEC on November 5, 2012, Defendants stated that "existing cash, cash equivalents and marketable securities and funds generated from operations should be sufficient to meet our working capital and capital expenditure requirements, and meet our obligations for the next 12 months."  Id. ¶ 128.  Plaintiffs claim that dividends are

an obligation of Atlantic Power, and that the company knew that it could not service its debt and manage its capital expenditures unless it slashed its dividend.  Id. ¶ 129.

On November 6, 2012, the company hosted a conference call, during which Defendant Welch again addressed the sustainability of the dividend and the Florida projects, largely repeating what he said in the August 8, 2012, conference call.  Id. ¶ 130.  In doing so, Defendant Welch also reiterated that the company expected "further contributions from ongoing accretive acquisitions and dispositions, which further support the company's continued ability to pay its dividend."  Id.

>        (7)        Certifications

Finally, Plaintiffs allege that the Q3 2012 10-Q, certified by Defendants Welch and Ronan, were materially false and misleading because they "did not fairly present in all material respects the financial condition, including its debilitating debt," of the company.  Id. ¶ 135.

>        D.        *Allegations Concerning Scienter*

Plaintiffs base their allegations that Defendants knowingly made these allegedly false and misleading statements on the following:  (1) the company undertook "crippling debt" in connection with certain acquisitions made during the Class Period, such that it knew or should have known that the dividend was unsustainable in the long term; and (2) from the start of the Class Period, Defendants knew that contracts for major cash-flow producing assets would not be renewed.  Id. ¶¶ 4-6.  Plaintiffs also contend that Defendants knowingly made these allegedly false and misleading statements based on (1) their access to inside company information, id. ¶ 23; (2) their positions within the company, which gave the Individual Defendants the opportunity to commit the alleged fraudulent acts, id. ¶ 24; and (3) the benefits that the Individual Defendants directly received from the delay in reducing the dividend, id. ¶¶ 77-90.

(1)     Increased Debt

The complaint alleges that, according to SEC filings, the company's strategy was to increase its value through acquisitions in the North American market while maintaining its cash flow to support the dividend. Id. ¶ 38. To do this, the company took on "debilitating amounts of debt that it knew would eventually take its toll on the cash flow of the company." Id. Plaintiffs allege that "the true size, character, and impact of the debt and service of the debt was unclear to investors during the Class Period." Id. ¶ 39.

The first acquisition detailed in the complaint for which the company took on "massive debt" was the acquisition of CPILP. Id. ¶¶ 40-41. This acquisition was announced at the start of the Class Period, on June 20, 2011, and was completed on November 5, 2011, with a purchase price of approximately $1 billion. Id. ¶¶ 41, 96. Plaintiffs explain that on the 2011 Form 10-K, the company claimed that it had acquired CPILP for CDN $506.5 million in cash and 31.5 million in common stock, but that "[a]lmost 100 pages later, buried in the 10-K notes, the Company revealed that the fair value of the consideration was actually $601.8 million in cash and $407.4 million worth of common shares less cash acquired of $22.7 million." Id. ¶ 41. Moreover, Plaintiffs allege that "[a]lso buried deep in the notes to the 2011 10-K" is a table that "[m]ask[s] . . . the fact that, as part of the acquisition of CPILP, the Company also assumed the longer term debt and tax liability of CPILP of approximately $915 million." Id. ¶ 44. This debt was not disclosed to shareholders in the June 20, 2011, press release announcing the acquisition. Id. ¶ 44.

To finance the CPILP acquisition, the company completed a private placement of $460 million aggregate principal amount of 9% senior notes, but in its 2011 Form 10-K the company did not inform investors the purpose for which this financing would be used, as the company had

previously stated its intent to use these proceeds for the CPILP transaction in press releases issued in October and November 2011.  Id. ¶ 42.  Moreover, to determine the character of that debt, the complaint alleges that one would have to compare the debt listed in the 2011 Form 10-K to the debt listed in past 10-Qs and 10-Ks, which reveals that the debt included a $190 million aggregate principal amount of 5.9% senior notes due July 2014 (the "Curtis Palmer Notes").  Id. ¶ 44.  After the acquisition of CPILP, the company's long-term debt grew from $295 million as of September 30, 2011, to $1.4 billion as of December 31, 2011.  Id. ¶ 45.  Principal payments due on the maturities of the company's debt are listed in the Complaint for the next five years; in 2014, $209,854,000 is alleged to be due.  Id. ¶ 46.

Additionally, Plaintiffs allege that the debt acquired from the CPILP acquisition caused a default event in connection with a 2007 Note Purchase and Parent Guaranty Agreement, which governs $150 million of Series A Notes and $75 million of Series B Notes of the company, because the new debt created a "ratio of debt to capitalization of CPILP and Atlantic Power (US) GP" that violated a financial covenant of the Agreement.  Id. ¶ 47.  The company had disclosed the existence of this covenant in the 2011 Form 10-K, but did not disclose that it had been forced to enter into an amendment to the Agreement shortening the maturity of the notes by two years until approximately nine months after the CPILP acquisition—a disclosure allegedly "buried" in the 10-Q for Q2 2012.  Id.

Plaintiffs further allege that the company did not report that, as a result of the debt undertaken pursuant to the CPILP and other transactions, the company's leverage ratio increased, which would require the company to pay more interest.  Id. ¶ 48.  Since the company's payout ratio was approximately 100% throughout the Class Period, "the only option was for the Company to continue to borrow or issue equity."  Id.

In the face of this growing debt, the company announced another large purchase and sale agreement in November 2012 of Ridgeline Energy Holdings, Inc. for approximately $88 million. Id. ¶ 49. The company announced that it would issue convertible debt to pay for the acquisition, which closed in December 2012. Id. Plaintiffs allege that the company did not disclose that it had also consolidated $303 million of Ridgeline debt until January 2, 2011 [sic 2013], after the completion of the acquisition. After the acquisition, the company's long-term debt is alleged to have totaled $1.459 billion with current maturities of approximately $121.2 million due within the next 12 months. Id.

In addition to the CPILP and Ridgeline acquisitions, the company allegedly made significant capital expenditures on newly acquired projects, including Canadian Hills Wind, LLC, Meadow Creek, and Piedmont. Id. ¶¶ 52-60. Plaintiffs contend that one needs to "sift through multiple press releases and 10-Qs" and "scour" the company's financial disclosures to get a clear picture of these transactions. Id. The acquisition and development costs for these properties further increased the company's debt. Id.

           (2)      PPAs

Plaintiffs also allege that Defendants knew that the company could not sustain the dividend based on the fact that two of its PPAs for the Lake and Auburndale facilities in Florida were set to expire by the end of 2013, and that Defendants were aware that these contracts would not be renewed. Id. ¶¶ 6, 70-76. In its 2011 Form 10-K, the company disclosed that it was in discussions regarding new PPAs for these facilities, which represented a significant portion of the company's earnings. Id. ¶¶ 70-73. In the third quarter of 2012, Progress Energy Florida requested a proposal to secure a PPA for the Lake project for 2016-2018, and the company during that time continued to pursue other re-contracting options for Auburndale. Id. ¶ 74. In

December 2012, the company was advised that its bid regarding the Lake projected was rejected, after which it issued a Form 8-K informing investors of a $50 million impairment charge relating to the Lake Project due to "the absence of realistic prospects to secure profitable PPAs for the Project in the near-term. Id. The company announced the sale of its Florida-based projects, including Lake and Auburndale, on January 30, 2013. Id. ¶ 75.

III.    Facts Alleged in the Proposed Amended Complaint

In the proposed Amended Complaint, Plaintiffs add factual allegations relating to Defendants' actions after the company announced its dividend reduction on February 28, 2013. On a March 1, 2013 conference call, Defendant Welch stated that the dividend reduction was caused, at least in part, to the tough market it encountered in financing the CPILP acquisition. Am. Consolidated Class Action Compl. ¶ 138 ("Am. Compl.").

The proposed Amended Complaint details further statements made by Defendants after the close of the Class Period clarifying the extent to which the company's debt caused the dividend reduction. For instance, the Amended Complaint alleges that on August 8, 2013, the company disclosed in its Form 10-Q for Q2 2013, that it would likely violate a crucial debt covenant in its 9% senior notes requiring the company to maintain a certain fixed charge coverage ratio. Id. ¶ 144. The next day, on August 9, 2013, Defendant Welch began discussing the company's plans to reduce its debt. Id. ¶ 145. In disclosures made and on conference calls held in November 2013, the company continued to inform investors that it may violate that debt covenant and stressed its new priority of reducing its debt. Id. ¶¶ 147-49. In February 2014, the company announced that it had violated the covenant, triggering a restrictive payment clause preventing dividend payments from exceeding "the restricted payments 'basket' of the greater of $50 million and 2% of consolidated net assets." Id. ¶ 151.

In September 2014, the company cut its dividend by another 70% and announced that it would switch from monthly to quarterly dividends.  Id. ¶ 156.  The company attributed the cut, at least in part, to its debt.  Id.  The September 16, 2014, press release announcing these changes also announced Defendant Welch's departure from the company.  Id.

IV.    Discussion

      *A.*    *Elements of a Rule 10b-5 Claim and Pleading Standards*

A claim of securities fraud under section 10(b) and Rule 10b-5 has six elements:  (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).  As with any motion to dismiss, the court "accept[s] well-pleaded factual allegations in the complaint as true and view[s] all reasonable inferences in the plaintiffs' favor."  Id.  To survive a motion to dismiss, a complaint must include factual allegations that, taken as true, demonstrate a plausible claim for relief.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–58 (2007).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In securities fraud cases, the plaintiffs must also meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.  Under Rule 9(b), plaintiffs must plead fraud with particularity.  Fed. R. Civ. P. 9(b).  Under the PSLRA, plaintiffs must "'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'"  ACA Fin. Guar. Corp., 512 F.3d at 58 (quoting 15 U.S.C. § 78u-4(b)(1)).  In addition, the PSLRA "separately imposes a rigorous pleading standard on allegations of scienter."  Id.

B.      *Scienter*

To sufficiently plead scienter in a securities fraud case, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2).  "Scienter is a mental state embracing intent to deceive, manipulate, or defraud." NJ Carpenters Pension & Annuity Funds v. Biogen Idec Inc., 537 F.3d 35, 44 (1st Cir. 2008) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).  In the First Circuit, "a plaintiff may satisfy the scienter requirement with a showing of either conscious intent to defraud or a high degree of recklessness." ACA Fin. Guar. Corp., 512 F.3d at 58 (quotation marks and citations omitted).

"The PSLRA requires that the plaintiffs' complaint, 'with respect to each act or omission . . ., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" NJ Carpenters Pension & Annuity Funds, 537 F.3d at 44 (quoting § 78u-4(b)(2)).  When determining whether a plaintiff has sufficiently pled scienter, the court must examine the complaint as a whole and consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007) ("Congress did not merely require plaintiffs to provide a factual basis for their scienter allegations . . . .  Instead, Congress required plaintiffs to plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference.").

Moreover, because "[t]he strength of an inference cannot be decided in a vacuum. . . .  a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 323–24.  The inference of scienter "need not be irrefutable," but "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." Id. at 324.  "[F]acts rendering an

inference of scienter at least as likely as any plausible opposing inference" is sufficient.  Id. at 328.

A number of decisions in this circuit provide a set of principles relevant to the instant analysis.  Most instructive is the First Circuit's decision in ACA Fin. Guaranty Corp., where the plaintiffs alleged that the defendants—school administrators, trustees, and the underwriter investment banking firm—had made material misstatements and omissions in the Official Statement issued in connection with certain bonds.  512 F.3d at 53.  After the school failed to reach its targets for increased student enrollment and reduced financial aid awards, it ceased operations, causing the bonds to default.  Id. at 53–54.  Similar to the instant case, the plaintiffs in ACA Fin. Guaranty Corp. claimed that the Official Statement "was issued within the context of a serious financial crisis . . . and [that] the defendants had motivation to conceal the crisis so that they could continue to finance their operations."  Id. at 59.

According to the plaintiffs, the school was (1) too optimistic when it stated that it could meet its goals and (2) failed to disclosed available information suggesting that it was unlikely to do so.  Id. at 60.  In addressing the plaintiffs' claims, the First Circuit made a number of observations relevant here.  First, the court explained that the securities laws do not mandate that a company disclose all material, nonpublic information in its possession.  Id. at 61.  For instance, the school's 60% attrition rate did not have to be disclosed because revenue was a function of total enrollment levels, and that information had been accurately provided to investors.  Id.

Second, "[a] plaintiff may not plead 'fraud by hindsight'; i.e., a complaint 'may not simply contrast a defendant's past optimism with less favorable actual results' in support of a claim of securities fraud."  Id. at 62.  In ACA Fin. Guaranty Corp., the plaintiffs claimed that the school's enrollment projections were deceiving because its applications had increased due to the

school's recent acceptance of an online standardized application, which artificially inflated its application numbers.  Id.  These allegations, however, fell short because the amended complaint did not "establish that the defendants were aware of facts, at the time they made their predictions, that would have made those predictions unreasonable."  Id.

Third, the PSLRA requires a plaintiff to "'state with particularity all facts on which [a] belief is formed.'"  Id. (quoting 15 U.S.C. § 78u-4(b)(1)).  Where the plaintiffs alleged that the defendants had materially omitted the fact that the number of students who had placed deposits with the school had declined by almost 20%—which the defendants had allegedly known at the time that they issued the Official Statement—the court stated that the plaintiffs "have not included details about how they were able to identify the 20% figure, much less whether this information was known to the defendants at the relevant time."  Id. at 62–63.  The court noted that although "the PSLRA does not require plaintiffs to plead evidence. . . . more meat was needed on these bones."  Id. at 63.

Finally, the court in ACA Fin. Guaranty Corp. was troubled by the allegation that the Official Statement had stated that the school would reduce its financial aid spending to 28.8% of student income in 1998-1999, when a budget was alleged to have existed "pegg[ing] financial aid spending for 1998-1999 at 31.3% of student income."  Id. at 64.  Assuming that this alleged misrepresentation was material, the court found that the plaintiffs failed to plead sufficient facts strongly inferring that the defendants had made the misrepresentation with intent to deceive, as "[m]ore than mere proof that the defendants made a particular false or misleading statement is required to show scienter."  Id. at 65.  The plaintiffs argued that scienter could be inferred because (1) the defendants were in possession of a budget contradicting the numbers provided in the Official Statement, and (2) such budget would have portrayed an upward trend in financial

aid expenditures, warning off investors, id.; but the court found that this inference was not at least equally as strong as other inferences in part because "the Official Statement as a whole candidly laid out the sorry financial history of the college and, for most of its estimates and projections as to a happier future, it provided accurate and non-misleading information." Id. at 66.

C.    *Rule Application*

Here, the court need not decide whether the complaint alleges actionable misstatements and omissions because it finds that the complaint does not plead particularized facts giving rise to a strong inference of scienter. See Auto. Indus. Pension Trust Fund v. Textron Inc., 682 F.3d 34, 39 (1st Cir. 2012) ("We need not decide the materiality issue because the complaint fails to adequately allege scienter.").  The crux of Plaintiffs' argument that they have met the PSLRA's heightened pleading standard for scienter is that, as demonstrated by the detailed financial analysis contained in the Complaint, the company took on such "crippling debt" that Defendants knew or should have known that it would not be able to sustain the dividend for the long term. Even assuming, however, that Defendants' statements that the company had the ability to handle its debt and maintain the dividend were empirically false at the time they were made, Plaintiffs have not pled facts inferring anything more than that Defendants simply mismanaged the company and erred in the assessment of its financial condition.

Aside from Plaintiffs' detailed accounting of the company's books—information which had been contemporaneously disclosed in the company's public filings—, Plaintiffs allege no facts inferring that Defendants knew that any of the challenged statements were false or misleading.  In lieu of alleging such facts, Plaintiffs rely on two grounds:  (1) that the company's financial picture was so bleak and its debt so great that Defendants, as well as any other

reasonable person, should have known that the dividend was unsustainable; and (2) that Defendants' disclosures were "presented in a labyrinthine manner designed to confuse investors," which evidences Defendants' intent to deceive the market. See Pls.' Opp. Defs.' Mot. Dismiss Consolidated Class Action Compl., 16 [#101] ("Pls.' Opp.").

Plaintiffs' first ground is deficient because it does not rest on particularized allegations and because Plaintiffs do not contend that any information was ultimately withheld from the public. Rather, Plaintiffs base their complaint on the company's contemporaneous disclosures made in public filings. To say that the company's financials were such that Defendants should have known that the dividend was unsustainable is to say that the market also should have known that the dividend was unsustainable—both Defendants and the market based their financial projections for the company on the same exact information. Thus, by Plaintiffs' own logic, if based on this information Defendants knew or should have known that the company could not sustain the dividend because of its debt, the market would have been aware as well. That was not the case. Cf. In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d 332, 343–44 (D. Mass. 2009) (Plaintiffs did not merely plead fraud by hindsight where their allegations were based on interviews with twelve former employees, engineers, and heads of distributors, in which they alleged, from their interactions with company executives, that the executives knew that sales demand had been decreasing despite statements that they expected sales to increase); Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) (vacating the district court's judgment dismissing the case for failure to plead scienter where the plaintiffs' specifically alleged that the company's financial statements were false and misleading because they overstated the value of the company's inventory in light of the undisclosed "Box and Hold" practice whereby a substantial amount of inventory was stored in several warehouses without being marked down.).

Likewise, the court finds that Plaintiffs' second ground is equally unpersuasive. In contending that Defendants' labyrinthine disclosures evidence its intent to deceive the market, Plaintiffs argue that the debt and liabilities that the company assumed upon acquiring CPILP—which amounted to approximately $915 million—was not disclosed to shareholders in the press release announcing the acquisition in June 2011, and that as part of that debt, a $190 million aggregate principal amount of 5.9% senior notes (the Curtis Palmer Notes) were due in July 2014. Pls.' Opp., 17. Plaintiffs also contend that the company purposefully delayed disclosing that the debt acquired from the CPILP acquisition caused a default event in connection with the 2007 Note Purchase and Parent Guaranty Agreement because that new debt created a "ratio of debt to capitalization of CPILP and Atlantic Power (US) GP" that violated a financial covenant of the Agreement. Id.; see Compl. ¶ 47. According to Plaintiffs, because Defendants knew about the Agreement's financial covenant, it, therefore, "must have known" that a violation of the covenant had occurred at the time of the CPILP acquisition, but disclosed that information approximately nine months later in its Form 10-Q for Q2 2012, in which the company revealed that it was forced to enter into an amendment to the Note Purchase and Parent Guaranty Agreement. See Compl. ¶ 47; Pls.' Opp., 18. Finally, Plaintiffs argue that the company's nondisclosure of its leverage ratio and total net interest was misleading in light of the company's direction to investors to focus on cash available for distribution and dividend payout ratio. Id., 13.

As an initial matter, Plaintiffs do not argue that any financial information, other than the company's leverage ratio and total net interest, was ultimately withheld from the public or was inaccurately disclosed. The Curtis Palmer Notes, although not disclosed at the time the company announced the CPILP acquisition in June 2011, were clearly disclosed multiple times in the 2011

Form 10-K in the Notes to Consolidated Financial Statements under the subsection of long-term debt. See Suppl. Decl. Roger A. Cooper Further Supp. Defs.' Mot. Dismiss, Ex. BB. [#114-2]. In that disclosure, the company stated that the Notes included a financial covenant generally based on the ratio of debt to capitalization. Id. Moreover, Plaintiffs admit that the violation of the Note Purchase and Parent Guaranty Agreement's financial covenant was disclosed nine months after the CPILP acquisition, and its allegation that Defendants knew the violation had occurred at the time of the acquisition is based on nothing more than Defendants' knowledge that the covenant existed. See Compl. ¶ 47.

At most, these allegations concern the complexity and form of Defendants' disclosures, which may, in the appropriate instance, result in an actionable misstatement or omission if they mislead or do not adequately inform the public. See Pavlidis v. New England Patriots Football Club, Inc., 737 F.2d 1227, 1232 (1st Cir. 1984). Even, however, if the court were to assume that Defendants' disclosures were, at times, inadequate, such assumptions do not answer the altogether different question whether Plaintiffs have pled a strong inference of scienter. See ACA Fin. Guaranty Corp., 512 F.3d at 65 ("More than mere proof that the defendants made a particular false or misleading statement is required to show scienter."). Here, absent allegations inferring that Defendants' intentionally sought to mislead the market, the court finds that the form and timing of the challenged disclosures are not so deficient as to show a strong inference of scienter. See Fire and Police Pension Ass'n v. Simon, __ F.3d __, 2015 WL 500748, at *11 (1st Cir. 2015) ("If it is questionable whether a fact is material or its materiality is marginal, that tends to undercut the argument that defendants acted with the requisite intent or extreme recklessness in not disclosing the fact.") (quotation marks and citation omitted). Defendants' ultimately full and accurate disclosures of Atlantic Power's financial data cuts against a strong

inference that they were attempting to hide or mislead the public as to the company's financial health.  See id. at *12 ("Abiomed's substantial disclosures about its correspondence with the FDA. . . . undercut any inference of scienter."); ACA Fin. Guaranty Corp., 512 F.3d at 66 (finding that the inference that the defendants acted with the requisite scienter was not at least equally as strong as other inferences in part because "the Official Statement as a whole candidly laid out the sorry financial history of the college").  Moreover, omission of the leverage ratio and change in net interest are not highly unreasonable omissions such that one can infer intent to mislead—they are basic calculations of total liabilities divided by total equity and the subtraction of one year's new interest from another's, respectively.  See Compl. § 48, 51.

Plaintiffs' also allege that the Individual Defendants had motive and opportunity to mislead the public, as they had access to inside information and directly benefited from the alleged delay in reducing the dividend.  See Compl. §§ 23, 77.  This benefit, according to Plaintiffs, consisted of "unjustly high cash bonuses and the vesting of previous awards that probably would not have vested."  Id. § 77.  To support these claims, Plaintiffs describe the company's management compensation structure and how, due to this structure, delaying the dividend cut benefited the Individual Defendants' compensation.  Id. §§ 80-89.  For instance, the complaint alleges that management's performance evaluation is based partly on "effective capital raises" and "expanded analyst coverage and strengthened credit rating," and that the alleged delay in reducing the dividend strengthened these two benchmarks.  Id. § 82.  As a result of this alleged fraud, Defendant Welch purportedly received a $750,000 total cash bonus for 2011 and notional shares that had been awarded to him in 2010 had vested at 50%, "when in the absence of manipulation, these awards would have been forfeited."  Id. §§ 87-89.

These allegations, alone, are insufficient to meet the heightened standard for pleading scienter under the PSLRA.  As the First Circuit made clear in Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999), "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are not sufficient."  Id. at 197. Instead, "Plaintiffs must couple these allegations . . . with 'some additional misconduct' that gives rise to an inference of scienter."  In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d at 344 (quoting Baron v. Smith, 285 F. Supp. 2d 96, 108 (D. Mass. 2003)).  "That the executives may have gained some compensation is not enough, since stock-based compensation is a common feature of pay packages . . . ."  Id.  Here, Plaintiffs do not plead any additional or unusual facts concerning the company's executive compensation or the Individual Defendants' receipt of compensation under the company's pay packages.  Standing alone, these allegations are, therefore, insufficient.

Lastly, Plaintiffs argue that scienter is adequately alleged by way of "the temporal proximity between Defendants' informed positive statements and the adverse disclosure of the dividend cut."  Pls.' Opp., 29.  "While the short time frame between an allegedly fraudulent statement or omission and a later disclosure of inconsistent information does not, standing alone, provide a sufficient factual grounding to satisfy Rule 9(b), there is nothing in Rule 9(b) that precludes consideration of such temporal proximity as a circumstance potentially bolstering the complaint's claims of fraud."  Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1225 (1st Cir. 1996) (internal citation omitted), superseded by statute on other grounds.  Here, the last alleged misstatements were made by Defendant Welch on a conference call on November 6, 2012, and the dividend cut was announced almost four months later, on February 28, 2013.  Even after

considering the temporal proximity between the two statements along with Plaintiffs' other allegations, Plaintiffs do not plead facts showing a strong inference of scienter.

Because Plaintiffs have not adequately pled a claim under section 10(b) and Rule 10b-5, Plaintiffs' claims against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, must also fail.  See ACA Fin. Guar. Corp., 512 F.3d at 67 ("The plain terms of section 20(a) indicate that it only creates liability derivative of an underlying securities violation.").

Finally, Plaintiffs' unjust enrichment claim must fail because it is a derivative claim and Plaintiffs have not attempted to comply with the requirements of Federal Rule of Civil Procedure 23.1 and Section 233(1) of British Columbia's Business Corporations Act.  "In determining whether a claim is direct or derivative, the Court must apply the law of the corporation's state of incorporation."  In re PHC, Inc. S'holder Litig., No. 11-11049-GAO, 2012 WL 1195995, at *2 (D. Mass. Mar. 30, 2012) (citing Kamen v. Kemper Fin. Servs., 500 U.S. 90, 97 (1991)).  Here, Atlantic Power is incorporated in British Columbia, Canada.  See Compl. ¶ 19.  Under British Columbia law, a claim is derivative if it "suggest[s] injury to the corporation" and "do[es] not suggest that the plaintiff has been personally or uniquely affected."  Hoet v. Vogel, [1995] B.C.J. No. 621 (B.C. S.C.).  Here, Plaintiffs allege that the Individual Defendants received unjustly high bonuses from the company resulting from their alleged misconduct.  See Compl. ¶ 173.  To correct this alleged inequity, Plaintiffs state that "[those] benefits should not be held or retained by the Individual Defendants and should be disgorged back to the Company."  Id. ¶ 174.  Thus, because "[t]he plaintiff's allegations relate to potential injuries to the company, and therefore any injury suffered by the plaintiff is indirect," "the action is properly brought as derivative."  Hoet, [1995] B.C.J. No. 621.

Under Section 233(1) of British Columbia's Business Corporations Act, a plaintiff wishing to prosecute a derivative action must make "reasonable efforts to cause the directors of the company to prosecute or defend the legal proceeding." Because Plaintiffs do not plead that they made such efforts, their unjust enrichment claim must be dismissed. See Hoet, [1995] B.C.J. No. 621.

D.    *The Proposed Amended Complaint*

As recounted above, the proposed Amended Complaint adds allegations concerning statements made by Defendants after the February 28, 2013 dividend reduction announcement. Specifically, these statements concerned the negative effect of Atlantic Power's debt on the company and the company's plans to reduce its debt. Although these allegations demonstrate that Defendants underestimated the impact of Atlantic Power's debt during the Class Period, for the reasons explained above, they do not constitute facts giving rise to a strong inference of scienter. The court, therefore, denies Plaintiffs' motion to amend as futile. See Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996).

V.    Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss the Consolidated Class Action Complaint [#85] is ALLOWED and the Consolidated Class Action Complaint [#81] is hereby dismissed. Plaintiff's Motion to Amend [#104] that complaint is hereby DENIED.

IT IS SO ORDERED.

Date: March 13, 2015                                    /s/ Indira Talwani
                                                        United States District Judge